### THE M. J. RUDOLPH.

(District Court, E. D. New York. January 5, 1920.)

COLLISION ⊂⊃102—MUTUAL FAILURE TO KEEP PROPER LOOKOUT.

Collision between a small tug crossing East River, but which, on nearing the Brooklyn side, had turned upstream and was moving nearly parallel with the piers, and an overtaking steam lighter, passing up, *held* due to faults of both vessels in failing to keep proper lookout.

In Admiralty. Suit for collision by Thomas F. Timmins and others, doing business as the Croton Water Company, owner of the tug Roach, against the steam lighter M. J. Rudolph. Decree for libelants for half damages.

Foley & Martin, of New York City, for libelants.

Park & Mattison, of New York City, for claimant.

CHATFIELD, District Judge. On July 29, 1918, at a little after five in the afternoon, a small tug, called the Roach, and belonging to the libelant, left Pier 7 on the Manhattan side of the East River, to go to a water hydrant at the end of a short pier located on the Brook-

lyn side of the East River, near where the Penn Annex Ferry slip formerly was located, and immediately north of the large Pier 4 at the foot of Fulton street, Brooklyn. The tide was running strong ebb, and the Roach, in order to avoid a tow coming down the river, headed across, so as to reach the protection of the Brooklyn shore, instead of going up along the New York shore until she could run straight across the river. The Roach passed on the New York side of a suction dredge located several hundred feet from the Brooklyn piers, and then took her course so as to run directly up the river toward the Brooklyn side of the span of the Brooklyn Bridge. She thus expected to reach a point where she could turn into the dock above Pier 4, as soon as she could observe the conditions at that pier, and yet before she would be struck by the strong rush of the tide under the Brooklyn Bridge.

Just behind her, passing up the Brooklyn side of the East River, was the deck lighter Rudolph, which has its pilot house located aft of its derrick mast and back of the cargo space upon the main deck. The captain of the Rudolph was in his pilot house while the deckhand and others working upon the boat were at various points principally near the stern of the boat on the starboard side. The captain of the Rudolph saw the Roach when the Roach was some 200 or 300 feet away from the end of Pier 4, and when she was pursuing a course slightly crossing that of the Rudolph, but in general heading up the East River. The deckhand of the Rudolph observed the Roach at about the same time as she was seen by the captain of the Rudolph, but gave no alarm, as the captain was cognizant of the Roach at the time

Apparently the captain of the Rudolph diverted his attention while the mast of the Rudolph obstructed the Roach from view, and while he was looking out of his starboard pilot house window at the Brooklyn shore, or at the men upon the starboard side of his own lighter, and the next any of the men on the Rudolph knew the Roach was almost across the bow of the Rudolph, and so near that, although the engines of the Rudolph were reversed, she struck the Roach, which was carried a little distance up the river, and rolled over, so that her captain and his engineer were forced to jump overboard and swim to the upper corner of Pier 4.

All of the parties locate the collision at 150 feet out from the face of Pier 4 and approximately near the middle of the pier. Evidently the Rudolph must have carried the Roach upstream a sufficient distance, so that the men swimming from the Roach could reach the upper side of that pier.

The testimony does not show definitely whether they would be carried down by the ebb tide, or may have been carried up somewhat by the eddy formed between the Brooklyn Bridge and Pier 4; but this is not of great importance in the case. The Roach was short its deckhand, who had not shown up that day for work, and it was therefore without a lookout. The captain of the Roach and the engineer on that boat were entirely oblivious of the presence of the Rudolph, which evidently was proceeding at twice the speed of the Roach, and thus was overtaking her, up to the moment of collision.

It is evident from the testimony that the captain of the Rudolph, as well as the lookout of the Rudolph, were negligent in failing to appreciate the approach of the Roach to the Brooklyn shore, and to realize that they were overtaking and passing a boat which was getting into dangerous proximity, even though it was proceeding, according to their assumption, on a course parallel to their own up through the Brooklyn Bridge. The configuration of the Brooklyn shore and the narrowness of the space under the Brooklyn Bridge made the courses of the Rudolph and the Roach converging, and the burden was upon the Rudolph, in overhauling the Roach, to pass her in safety. A whistle signal, or care on the part of the lookout, would have averted the collision.

But evidently the captain of the Roach has placed himself in a dilemma from which he cannot extricate himself. In order to avoid the conclusion that he was on a crossing course, and that he was approaching Pier 4 with the Rudolph on his starboard hand, and that he was at fault for failing to blow a two-whistle signal, he has insisted and strenuously explained that he was running parallel with the Brooklyn shore, and therefore was not on a course converging with that of the Rudolph.

An examination of the chart makes it plain that, if he were on a parallel course with that of the Rudolph, he would have been in no position to make the slip above Pier 4, as he explains that he was doing. He was running without lookout, in the absence of a deckhand. He kept no lookout himself, except to observe the boats apparently that were coming down through the Brooklyn Bridge. He allowed the Rudolph to get so close that the strong ebb tide, as it came through the Brooklyn Bridge, swept him in and directly across the bow of the Rudolph, without giving warning to that vessel of any need of space in which to execute the maneuver.

The Roach was a small boat, used as a water boat, and her captain estimates that, with an ability to make a speed of but 3 or 4 knots an hour, he could successfully buck the tide in the East River, which he estimates runs 15 knots an hour.

The collision in question is one which could have been easily avoided by careful observation and lookout on the part of either vessel. Both vessels were actually at fault, and they are fortunate in that the damage was not greater, and that the men who were forced overboard escaped without injury. Both should bear responsibility, and the libelant may have a decree for one-half of his damages.